Good morning, Your Honors. May it please the Court, I'm Paul Kampmeyer on behalf of the Northwest Environmental Defense Center. My client seeks reversal of the District Court's order in judgment dismissing its Clean Water Act citizen suit. With the Court's permission, I'd like to reserve four minutes for rebuttal. The question presented by this appeal is whether pipes, ditches, and channels are point sources under the Clean Water Act. That question is reviewed de novo. NEDC alleged that the timber companies in the state are discharging stormwater associated with industrial activity without the required NPDES permits. The crux of the allegations, the crux of the lawsuit, is that the timber hauling in the Tillamook State Forest is grinding up the road surface, generating pollutants that are then picked up and carried away by stormwater. Who uses these roads besides the logging trucks? I don't know the answer to that question. The government in its amicus brief asserts that these roads are primarily used by recreational traffic, that the logging trucks are only a portion of it. Is there any evidence in the record one way or the other on that? I don't recall any evidence in the record. The allegations in our complaint, amended complaint, which are assumed to be true because this was a 12b6 dismissal, we allege that these roads are dedicated haul routes where, in the timber contracts themselves, the state and the hauling timber companies agreed to designate certain haul routes. The two roads at issue, the South Fork Trask and the Little South Fork and the Kilchis River, were dedicated, designated timber hauling routes. Does it make any difference to your argument that these roads may now be used for recreational purposes by private entities? I don't think it does. And here's why. I think your questions are getting to the question of whether the stormwater discharges and the pollutant discharges are associated with the industrial activity. And the allegations in the complaint and there's also, in addition to the allegations in the record, NRDC and EPIC in their amicus brief submitted some studies, one of which is a Scogsit study, that's the author's name, that demonstrate that timber hauling, these giant timber trucks, are the primary source of the sediment generated on these hauling roads. The trucks literally, the roads are graveled and the trucks literally grind up that gravel. And I don't think the same can be said of a fisherman's pickup truck. But the question is not what the pollution comes from so much of the current argument. The question is whether this is a point source within the meaning of the statute once we've got this regulation that ties it to industrial activity. Absolutely. I was merely trying to answer your questions about whether it matters that there may be other uses on the road. Well, I wasn't asking whether it matters in terms of how much pollution goes in. I'm asking whether it matters legally. And this is a related question. My understanding of most logging roads is that they are cut for purposes of logging and then they're used for logging purposes. But once we have the existing logging roads, they tend to be open for general use. Is that the case here, that this is absent the logging use, this road never would have been made? I think that's absolutely right. These are roads that are in the state forest that were built and are used and maintained for purposes of hauling timber out of the Tillamook State Forest. Now that structure has been around for a long time. Yes. This regulation has been in place for 30 years, is that right? That's my understanding, yes. And what you're saying is that this case presents an opportunity to tell the EPA that their regulation is inconsistent with the Clean Water Act, is that right? That's right. And why hasn't this argument been advanced over the course of 30 years? Why is this court competent to say that the EPA's regulation, which has been on the books for 30 years, that suddenly there's this epiphany about logging trucks on forest roads that says that they've been wrong for 30 years? Well, I think it wouldn't be an epiphany in this court six years ago in League of Wilderness Defenders construed this very regulation, 40 CFR 122.27, and said that it does not exclude other silvicultural point sources. Of course, we've alleged and the complaint and other evidence in the record demonstrates that these forest roads use pipes, ditches, and channels to convey and discharge polluted stormwater to rivers and streams. Could you explain just physically how that works on these roads? In other words, how does the stormwater runoff get collected? You say they're ditches, pipes, but are they just straight concrete ditches that are collected off the roads and they run into the streams or what? No, Your Honor. The way these roads work, and I want to both say how the roads work and then talk about how that's different from other forest practices, but the way the roads work is, as we've alleged in the complaint, the roads are graded so that the stormwater will run off the road to one side of the road or another, and on the side where it goes, there's typically a roadside ditch, man-made, that runs the length of the road. And then every so often, sometimes 150 feet, sometimes 300 feet, there's what we call a cross-stream culvert, which is literally a culvert, plastic or metal culvert, that is under the road, and the stormwater runs through the ditch, down through the culvert, and in the instances that we describe in the notice letter and in the complaint, then into the South Fork, Trask River, or the Little South Fork of the Kilchis River. There's also circumstances, these are called live stream culverts, where you might have a tributary coming off a hillside, a stream, just a natural running stream, and that roadside ditch will dump the polluted stormwater right into that live stream that's coming off the hillside, and then together the live stream and the stormwater will go under the road and into the river. Once the culvert has run under the road, whether coming simply out of the ditched water or out of the live stream plus ditched water, is there any ditching below that, or does that just run down the hillside as it will without regard to any independent ditching? It depends on the proximity of the road to the river, and in the two cases, in the two roads that we're talking about that are at issue in this case, the roads are stream parallel roads, and so the roads generally run relatively close to the river, and so if the culvert's not dumping directly into the river or the stream, there's a channel, most often a man-made channel. You can see it right there. It's certainly discernible confined and discreet, and it leads from the end of the culvert directly into the river or the stream. Now, there's no dispute, I think, that collecting stormwater in ditches and culverts and so on, so long as we're not talking silviculture, that's point source. As to say, I saw in one of the amicus briefs, and as far as I'm aware it's not contested, that Caltrans, which runs all the California highways, which has lots of ditching and culverts, that's point source stuff. Absolutely. So the question is not whether this is point source generally. The question is whether or not it's somehow been defined out of point source with respect to silviculture. I think that the question is absolutely, you're right about the premises, right? In 40 CFR 122.2, in 1979, EPA said, the discharge of a pollutant includes surface runoff, surface water collected and channeled by man. And the whole theme of 40 CFR 122.26, which is the stormwater regulation, is that collected and channeled stormwater is a point source discharge that's subject to regulation under the NPDES permit program. There's also a case in the 9th Circuit Committee to Save Mucalumna River that found stormwater discharges from a mine to be point source discharges. So there's no question that in every other context, stormwater that's collected, channeled, and discharged by man is a point source discharge. That's clear under all the case law, and we think it's clear under the forestry decision as well. Now, the EPA amicus brief, I'm sorry to change the subject, but we've got lots of things to talk about in a short time. The amicus brief filed by the EPA contends that there's a statute of limitations problem. What's your answer to that? I don't agree with that at all. First of all, that argument wasn't raised at the district court. Both the parties to this case, the timber company and the state appellees, agreed with our statement of jurisdiction and conceded that this court has jurisdiction under the appeal statute. And furthermore, this court just held in Northwest Environmental Advocates v. EPA, a decision you're familiar with, that the 509 limitations on challenging regulation apply where there's an effluent limitation, not where there's an exclusion or an exemption from an effluent limitation. So their argument, it seems to me, is not really a statute of limitations argument. It's fundamentally a subject matter jurisdiction argument. That is to say, their argument is that this case should have come directly to us instead of gone through the district court first. I think they're wrong there also because in association to protect Hammersley, Eld, and Todd Inlets v. Taylor Resources, the Ninth Circuit said that citizens can bring citizen suits that allege an unpermitted discharge of a pollutant and that the courts are perfectly capable of evaluating whether that's true. So as to the subject matter jurisdiction, Congress in the citizen suit provision, Section 505, gave this court jurisdiction, subject matter jurisdiction over our citizen suit. I think San Francisco Baykeeper v. Cargill Salt confirms that. Just following that line then, would the opinion, if we agree with you in this case, strike down the civil cultural activities regulation then? No, Your Honor. In footnote 7 of the Forsgren decision, this court found that 40 CFR 122.2 is a valid regulation. The real question here is whether it's been properly construed by the district court, whether it's been properly construed by EPA and the timber companies. The district court read the regulation to say that where certain activities generate pollutants and stormwater is involved in the discharge of those pollutants, that that is a nonpoint source activity. And we think that that's fundamentally at odds with the Forsgren decision because Forsgren said repeatedly that EPA may not exempt from NPDES. It can't redefine a statutory point source into a nonpoint source. So the Forsgren decision construed the regulation, but it said this regulation conforms to the statute. It conforms to the difference between point and nonpoint source pollution, and it doesn't exclude any point sources from the NPDES permit program because that's not allowable. So given Forsgren's construction of the regulation, we think it's a perfectly fine regulation. Our contention is that when you look at the language of the regulation, the phrase nonpoint source civil cultural activities from which there is natural runoff, that just doesn't apply here. We have point sources, pipes, ditches, and channels. They're not nonpoint sources. And where the stormwater runoff is collected and channeled by man, that's not natural runoff. Two district court decisions, the Epic litigation in Northern California and the Holly Ridge Associates litigation out of North Carolina, have both said that that's the case. Collected and channeled stormwater is not natural runoff. It's not a point source. And your argument with respect to construction of the regulation is that Forsgren tells us that the list of point sources in that regulation is not exclusive. I think Forsgren tells us a couple of things, and that is one of them. It certainly leaves room for the permitting of other civil cultural point sources as they are identified. And furthermore, the decision states in three different places that EPA may not exempt a statutory point source from the permit requirements of the NPDES permit program. I mean, we learned that a long time ago in Kostal. I mean, if it's a point source, it cannot be excluded. Absolutely, and Kostal is right on point. I mean, Kostal essentially looked at the statutory language and said that EPA was wrong. They couldn't exempt stormwater point source discharges associated with logging activities from the NPDES permit program. This court found, incidentally, Kostal was dispositive in both Forsgren and in Northwest Environmental Advocates, so it's been adopted by this circuit. I want to point out one of the arguments, since we've talked about legal wilderness defenders versus Forsgren and Northwest Environmental Advocates, I want to point out, going back to the regulatory language, that there are seven cases in the Ninth Circuit that talk about runoff and construe that term runoff. And so to look to the statutory language, I think the non-point source term is quite clear in the regulatory language, and I think the term natural runoff is quite clear, as construed by Epic and Hollywood Associates. But I want to point out that there are seven different Ninth Circuit cases, we cited them in our opening and our reply brief, that generally construe the term runoff, to say that is a non-point source discharge. EPA's construction of this regulation, I think this is going to come up, but it's not entitled to deference for a couple of reasons, as Forsgren found. It's not entitled to deference because their construction of the regulation conflicts with the statute by redefining point sources as non-point sources. And I think it also conflicts with how EPA treats stormwater in every other context. We've talked about that. The district court's decision, and it's not clear whether the district court relied on EPA's interpretation or not. It's not clear from the decision. But I want to point out that there's another line of cases that bears on this question of whether EPA can redefine point sources as non-point sources. And that's the line of cases that starts with U.S. versus Earth Sciences, Trustees for Alaska, which is a Ninth Circuit decision, and Sierra Club versus Abstin Construction. And all three of those cases talk about how it doesn't matter that a particular activity is the source of the discharge of pollutants. The fact that the pollutants are discharged from a point source, from a discernible, confined, and discrete conveyance, is the pertinent issue. So the activities that generate the pollutants and the presence of the stormwater is simply not pertinent to whether we have a point source. Another way of saying that is that Section 402P of the Act, which addresses stormwater, doesn't give EPA any authority to redefine what constitutes a point source. That question is answered by the statutory definition, as this court held in Northwest Environmental Advocates, held in Forsgren, and also held in Alaska Trojan Partnership. So, at this point, I think if the court doesn't have any other questions for me, I'll stop. One question, and it may not be in the record, is there anything in the record that tells us how widespread this problem is? By that I mean, I know there are logging roads all over the Ninth Circuit, but my question really is not so much that as to how many cases do we have in which the streams, the water is collected here and simply dumped straight in without settling basins and so on. I mean, there are various mitigating measures that can be taken with or without permits. Do we have any notion as to how widespread the physical problem is that we see exemplified in this case? Yeah, absolutely. There's a couple things in the record. In 2000, EPA, in a water quality report, recognized forestry as the fifth leading cause of water quality impairment nationwide. And there's reports and studies coming out of the Northwest that indicates that this is probably that roads, and I think it's a Meegan and Ketchison study that we cited in our amended complaint, found that roads are the primary source of sediment pollution associated with forestry. I referenced earlier some materials that EPIC and NRDC sought judicial notice of in their amicus brief. I can't remember whether the court has ruled on that. We've not yet ruled. Yeah. We will, but when we dispose of the data. So it's enormous. Yeah. It's enormous, and there's lots of evidence in the record, both in the NRDC materials and in our amended complaint. Okay. Okay, I'd like to reserve the rest of the time for rebuttal if I may. Yeah, please do. If it pleases the Court, Perel Ramchur on behalf of OFIC, AFMPA, and the Forest Project. Are you dividing argument? We are dividing time, and I will take 15 minutes. And Brad McLean from the EPA will take five minutes. Okay. All right. First of all, on the point of how enormous this problem is, I do want to make sure that the Court understands that this is an area that is regulated. It doesn't happen to be regulated by NPDES permits, but it is regulated. So it is a problem that's being addressed. NEDC's arguments in this case should be rejected for two fundamental reasons. First of all, NEDC's attacks on the district court. I'm sorry. Can I just do that? Sure. So you say it's regulated. And by that you mean, I would guess, what you mean is that their access to the area that cutting and so forth is a regulated activity. But are you suggesting that the regulations, that whoever is regulating it, is actually regulated with respect to things like catch basins and the runoffs, how it occurs and how it's collected? And that's in the record? There are best management practices that are put in place. That's in the record both in the state's brief on behalf of Oregon and also in the California amicus brief that was filed that details the California practices that are in place. So this is an area that is, in fact, regulated. It's been regulated for many, many years. But apparently these streams are not regulated beyond what they're now doing. That is to say, this particular runoff runs off the way it does without violating anything except possibly Clean Water Act. Is that correct? Well, it's regulated essentially as a nonpoint source runoff. So it's put to the states. Okay, let me ask the question in a different way. If you win this lawsuit, will your clients be required to do anything other than what they are now doing with respect to these logging roads and the drainage? No, but we are doing things now that are designed to benefit the water quality on the systems. There are ways in which the roads are to be constructed, ways in which the roads are to be maintained, ways in which we have to monitor. But the short answer is if you win this lawsuit, there's nothing in law that requires you to do anything other than what you're now doing. That's correct. Okay. NEDC's argument should be rejected for two reasons. First, the attack on the conclusion of the district court that these were nonpoint source runoffs is wrong, we believe. Second, even if NEDC were right and this were point source runoff, which we disagree with, the district court's ruling should be upheld because these are unregulated stormwater discharges under Section 402P of the Clean Water Act in EPA's Phase I and Phase II regulations. But to start with the first point about the district court's ruling being correct, the silvicultural rule expressly defines these types of runoff, or this type of runoff, as nonpoint source runoff. EPA repeatedly made clear, both in the preamble to its proposed rule that led to this regulation and in subsequent statements, that the regulation is intended to define all such runoff as nonpoint in nature, regardless of whether it happens to run through a channel or ditch on occasion. NEDC has tried to avoid this conclusion by arguing that this definition is somehow inconsistent with the point source definition in the statute. But this court has repeatedly held that EPA has authority to define point source and nonpoint source discharge where it is consistent with a reasonable interpretation of the statute. This regulation, this definition, is in fact based on a reasonable interpretation of the statute. Let me ask you this. I think you and I will be on common ground with this, but I want to make sure. Runoff from the California state highways that goes into ditches and through culverts and so on is currently regulated under the Clean Water Act under the permit process as point source. Correct. Correct. And do you agree that that in fact is point source that must be regulated under the Clean Water Act? Stormwater in general is governed by Section 402P. Is there a yes or a no? Well, I think I would like to actually qualify that answer because I think stormwater is a unique type of... You know, I asked a specific question and you can say yes or no and then you can qualify. I would say it's not compelled, Your Honor. So you say it's not a point source under the statute. I would say it's not compelled to be a point source EPA and Congress has chosen to regulate that as a point source because it can be construed as such. Congress has or EPA has? Congress has chosen to have municipal stormwater systems regulated as point sources through Section 402P. Congress in Section 402P said that discharges associated with industrial activity, discharges from certain municipal stormwater systems, certain types of discharges would be regulated through, you know, like point sources through the NPDES permitting process. It also said that other types of stormwater could be studied by EPA and there could be a determination of whether or not it should be subjected to the NPDES program. Could you address whether or not these logging roads are industrial activity within the meanings of 402P? Yes, we do. And could you address it right now? I'll address that right now. And in our view, they're clearly not industrial activities. And that's true for two reasons. First of all, in promulgating the definition of what is a discharge associated with industrial activity, EPA expressly excluded those activities that were excluded from the NPDES program in the silvicultural rule. So it cross-referenced the silvicultural rule and set those around. But that depends on how you read the silvicultural rule. And depending on how you read that, they're excluded or not excluded. And that's kind of the question in front of us. Understood. But putting that aside, even putting that aside, the runoff at issue in this complaint wouldn't meet the regulatory definition of a discharge associated with industrial activity in any event. On its face, that definition is limited to discharges from stormwater conveyances that are directly related to processes at an industrial facility and that occur in the immediate vicinity of the industrial activities at that facility. While the definition also includes discharges from immediate access roads, the word immediate makes it clear that those roads have to be connected with a facility. And in the preamble to the Phase I regulations, EPA specifically stated that the term immediate access road refers to roads which are used exclusively or primarily for the industrial facility. So it's clear that those roads have to be right there with the industrial facility. Sorry, I don't follow that. First of all, it says primarily. So that's useful in terms of if, in fact, there's snowboarding or whatever it is. If somebody else uses it, the question, the inquiry is, is it primarily used for logging? That's number one. Number two, the nature of logging, as I understand it, you're talking to a guy who lives in the city, right? So what do I know? But it's that you go to the logs. I mean, you go to the woods. It's a moving target. And so the only way you get from point A to point B generally is a road, and the road will continually change as the logging moves out and moves in different directions. So why is that not within the gambit of immediate? I mean, it means in connection directly, I would assume, immediate means something like in connection with, directly in connection with the logging process. That's what I don't understand. And let me ask that question because the preamble goes on to state that the term does not include public access roads such as state, county, or federal roads, such as highways or BLM roads, which happen to be used by the facility. In this case, there is evidence, I believe in the record, that these are roads that are open to the public. There's a map attached to the notice. That's where your primary. I mean, you gave a definition a little bit earlier about talking about whether it's exclusive or primary. I think I may have missed what you said. The word primary sort of awakened me, and the question is if it's primarily used. That's an issue of fact. It's primarily used for logging. Doesn't it meet the definition? Well, it says roads which are exclusively or primarily dedicated for use by the industrial facility. And there's no question that these roads are not primarily or, excuse me, exclusively or primarily dedicated for use by the industrial facility. These are roads. These are public access roads. They are state roads, county roads, that happen to be used by these organizations for timber hauling. Do we have anything in the record telling us why these roads were originally built? I don't think there's anything in the record specifically stating that. My understanding of logging roads is that the only reason they're there is to facilitate logging, and once they're there, other entities usually get to use them. Not always, but usually. These two roads, they're in the map attached to the notice letters, are roads that run alongside two rivers. They're public access roads. They have fishing sites on them and are used for recreational purposes along with logging. In fact, they're closed to any logging use by material in the record from November 1st until later in the year because it's the rainy season. So they're actually closed to logging use for a good part of the year. They're open for other use during that part of the year, but they're closed for logging use. So I think that the district court had that evidence in front of it, and there really is no suggestion that these roads could be construed as being used exclusively or primarily, or that they were exclusively or primarily dedicated. Now, in order for you to prevail in this case, do you have to convince us that Judge Patel got it wrong in the Epic case? We do think that Judge Patel got it wrong. I understand that, but I'm asking a slightly different question, and that is, in order for you to prevail, do you have to convince us that she was wrong? I believe that we probably do have to convince you that she was wrong. I think that's right. And I think she's wrong because she misapplied Chevron, and I think she's wrong because she misapplied Forsgren. The Chevron analysis, she said that the statute was in point source definition was ambiguous, so you could give deference to EPA, but she ended up not giving deference to EPA. She instead deferred to what she interpreted to be the Ninth Circuit's ruling in Forsgren, which is that you couldn't have any kind of runoff that could be construed as a point source being defined as a non-point source activity, whereas, in fact, our reading of Forsgren is that Forsgren says that you may not define something as a – well, let me back up. Forsgren involved a point source discharge of aerial pesticides directly into covered waters of the United States. The court held in Forsgren that that wasn't exempted or excluded from regulation by the civil cultural rule because it wasn't an activity from which there was natural runoff. There's no dispute in this case that the activities at issue here are, in fact, activities from which there is natural runoff. Well, I'm not sure that's right. It depends on how you define this. That is to say, outside the civil cultural context, if we have stormwater collected in culverts, ditches, and so on, that's point source. Well, and let me address that point. NEDC tries to argue that the term natural runoff can't be read to include any type of runoff that passes through a ditch or a culvert, but the civil cultural rule doesn't have any language supporting that conclusion. EPA's contemporaneous explanations of the civil cultural rule at the time it promulgated the regulation and in numerous subsequent regulatory statements make clear that the rule was specifically drafted to include runoff  The activities encompassed by the rule itself, which include road construction and maintenance, necessarily involve things that are going to involve runoff that's going to pass through a ditch or a culvert. Well, I think that's why it says not necessarily. But if it's not road construction or maintenance or anything else that's specifically exempted, I don't see how you get around to the idea that this in general is and not exempted from the definition of point source. Well, the problem here is that this type of runoff in general, as EPA recognized when it promulgated the civil cultural rule, runs in the borderland between what is traditionally considered a point source and what's traditionally considered a non-point source. And when it promulgated the civil cultural rule, EPA said this definition was reasonable for four basic reasons. First of all, it reflects the distinction between point source discharges, which are best regulated through NPDES permits, and non-point source pollution, which is best regulated through best management practices. It also reflected the fact that Congress had put in this Clean Water Act in the legislative history, provisions suggesting that forest service or forest or civil cultural runoff was predominantly non-point source in nature. It reflected the nature of the runoff, which was that it was precipitation driven, that it comes from diverse sources, and that it had standard characteristics and was best controlled by other types of practices aside from point source NPDES permitting. And finally, the EPA and the regulations said that the definition of a point source in the statute was arguably overbroad. It stated, when it promulgated the civil cultural rule, that not every ditch, water bar, or culvert is meant to be a point source under the Act, noting that this was particularly true where such devices merely serve the channel or drain pollution that is more properly considered non-point source in nature. And that's important, because if the point source definition is going to be read in a hyper-technical manner suggested by NEDC, it could deprive EPA of the ability to define any runoff as non-point source in nature. But that overbreadth to the extent that it exists, that argument doesn't really go to whether it's a point source when you have a road system with a system of ditches and culverts. And that appears to be, at least as I read what's going on with Caltrans and other road systems, that appears to be point source. Well, road systems, you know, large municipal road systems are one thing. Forest service road or forest roads like these are another thing. And EPA ---- Because? Because Congress actually drew a distinction between them in Section 402P of the Act. Congress said in Section 402P of the Act that certain types of systems actually need to have NPDES permits, and it gave EPA the discretion, recognizing EPA's expertise, to decide whether other types of systems need to be governed by that permit. That then comes back to the definition of the industrial, right? Well, no, that doesn't go back to the definition of the industrial necessarily, but it does go to the notion that forest roads are not considered to be regulated under EPA's Phase 2 rules. And another confirming factor, reason why these are not regulated under the Phase 1 rules, comes in the environmental defense case that we cite in a brief, where environmental advocates said when the Phase 2 rules came out that we should have regulated forest roads under Phase 2. And had they been regulated under Phase 1, EPA would have said so. The fact that it didn't shows that those roads are not regulated under Phase 2. Okay. Now you've ---- I want to give ---- I was going to say you've cut into his time, but it's not your fault. We'll give him five minutes or so. Okay, all right. Sure, sure. All right. Thank you. Thank you. All right. May it please the Court, Brad McLean for the United States, as amicus curiae. First, Judge Fletcher, I want to speak directly to your question about how roads are addressed under 402P. Roads are regulated under 402P if, one, they are part of either a small, medium, or large MS4 that is regulated in EPA's regulations at 40 CFR 122.26. Two, roads can be regulated if they involve disturbing more than one acre of land. And three, roads can be regulated if they are immediate access roads to an industrial source. So there are many roads that are not regulated. And fundamental to our argument here is that in addition to EPA properly defining these sources as non-point 30 years ago, EPA has also elected not to regulate these sources under 402P of the Clean Water Act. But, of course, as we know from, among other things, the Kostel case, some of that early decision, some of those early decisions by EPA not to regulate certain categories as point source, that's not stood the test of time. Yes, Your Honor. And the Congress acted specifically with regard to stormwater pollution when it enacted 402P in 1987. In doing so, Congress largely replaced a gap in the statutory framework, that gap being are certain sources properly defined as non-point or point, and it replaced it with an express delegation of authority to the agency to decide which sources of stormwater would need permits and which would not. So here, where there are forest roads that are not regulated as industrial activity under 402P, the Phase I regulations of the 402P, nor under the Phase II regulations, then this is not a source that has to get a permit, even if it's a point source. Could you address, or maybe perhaps elaborate a little bit, or maybe back away from your statute of limitations argument, because you're the only entity to make any statute of limitations argument. Your Honor, we construe, to the extent that you construe this case as an attack on the agency's 40 CFR 122.2, 122.7 regulation, that is not available here and is barred. To the extent that- But you're making that really as a subject matter jurisdiction argument, that is to say you're arguing that it should have come straight here instead of to the district court, and if it falls under the statutory provision that sends it straight here, then there's a statutory limitation period? Is that the chain of reasoning? Yes, Your Honor, that's part of it. I would take a step back and say that in the Northwest Environmental Advocates, the ballast water case, of course, in that case, the appellants there had petitioned EPA. EPA denied their petition. Then there was something to be reviewed, and that was reviewed by the district court and then this court. Here, there has not been a petition or anything to review. But if there's just a statute of limitations argument as distinct from a subject matter jurisdiction argument, if the statute of limitations argument has never been made, even if it's a valid defense, at some point it's waived. Yes, Your Honor, although 509B is jurisdictional. Well, but that's the question as to whether it's a subject matter jurisdiction. So we might want to go into whether or not that should have come to us originally. My reading of 509 is that it probably did not need to come to us originally. But if it's a purely statute of limitations argument and it's not involved in a subject matter jurisdiction argument, I think I don't see how it's anything but waived. Well, Your Honor, I'll move on and not press. Do you agree that if we're only talking statute of limitations unconnected to a subject matter jurisdiction argument, that any statute of limitations argument has been waived because not raised by any party to this suit? I'm not sure that I would agree with that. But it is correct that we did not expressly emphasize that argument in the district court. Do you mean you didn't raise it? Yes. Got it. Yes. Okay. So I return to the merits that are before us here. One of the things that this Court should strongly keep in mind is that under the Environmental Defense Center case, the remand in that matter, EPA is diligently assessing the nature and extent of runoff from forest roads and is trying to chart the best course forward. So this is a matter that is actually presently before the agency under remand respecting review of the Phase 2 rule. And EPA is in the best position to make the decision that Congress delegated. So we would ask this Court to uphold the district court dismissal of this case by deferring to the agency's construction of the statute and its regulations. Thank you. Okay. Thank you very much. Response? Thank you, Your Honor. I have just three and a half quick points to make here. And you've got about three and a half minutes, so. I'll try to be as quick as I can. Thank you. First, I want to talk about the Phase 1 rule. And that's 40 CFR 122.26. And here it's clear from the plain language of the rule that EPA regulated the logging industry and regulated the forest roads. In our brief, we talked about how it's mostly in our reply brief. But EPA listed SIC 2411, Standard Industrial Code 2411, which is logging in the rule without limitation. And they also regulated roads. There was a lot of focus on immediate access roads. Now, I want to make sure I'm understanding the framework of this argument. Does this argument go to the question as to whether this is industrial activity? Yes. Okay. This is going to the issue of whether the timber hauling that we're talking about is an industrial activity within the meaning of the Phase 1 stormwater. Right. And if it is industrial activity, then it's treated in a certain way. Okay. So you're arguing whether this is, and you're saying this is industrial activity. Yes. I'm saying it is industrial activity because EPA listed SIC Code 2411, which is logging, on the list and said logging is an industry that has to apply for permits for its point source stormwater discharges. Furthermore, EPA explicitly regulated material handling sites. And in the regulation, it defined material handling sites as areas used for the loading, unloading, transportation, or conveyance of raw materials. There is no ownership limitation, public road versus private road, in the rule for immediate access roads. That's clear. But there's certainly no limitation for material handling sites. And the language in the rule absolutely covers what's happening on these logging roads. I also want to address some of the other limitations. The rule isn't limited to stormwater discharges from industrial plants. EPA stated in the preamble that they were adopting that language and supplementing it with a whole bunch of activities associated with an industrial process. And we cited that language in our papers. EPA also regulated, in the Phase 1 rule, a lot of activities that don't occur at industrial plants. They regulated mining, construction, and a whole bunch of other things. Furthermore, this is important because both the appellees talk about how EPA can decide whether to regulate some silvicultural activities. In NRDC versus EPA, this court said, which is a 1992 case, if construction activity is industrial in nature and EPA concedes that it is, EPA is not free to create exemptions from permitting requirements for such activities. That holds true here. EPA said logging is industrial when it listed it on the Phase 1 rule. The court also said that if they're going to make an exemption, they have to do it because they say that this is not an industrial activity. And there's no evidence in the record that EPA thought some logging was industrial and some logging wasn't. So there's no basis for excluding any logging activities from the NPDES permit requirement. Finally, I just want to point out again that Forsgren rejected the main point, the main way that they construed the statute and the regulation. EPA said there was no intent in passing 122.27 to exclude any point sources. So I see my time is up. Thank you. You're right on the button. Thank you very much. Thank you. Thank you, both sides, for your useful arguments. Now, this is, in a sense, misdirected because everybody else is gone. But I would like to say on behalf of the bench that we have been very impressed by the quality of arguments here today, not limited to the one immediately, the one we just heard. Thank you.
judges: Fletcher, Fisher, Breyer